Whenever you're ready, we'll hear from you. Good morning, Your Honors. I'm Robert Elliott from Winston-Salem, North Carolina. Our firm represents the plaintiff, Whitney Stephenson, in this important case. Barbara Sloan, who is seated with me, represents the EEOC and will argue five minutes as an amicus. The issue which we present on this appeal goes to the very heart of the ADA and the enforcement powers of the court to ensure that able Americans are able to participate in the American workforce. There are two primary issues before you. The first is whether there are issues of fact for the jury as to whether driving herself to her client's offices was an essential function of Ms. Stephenson's position as a pharmaceutical sales representative when she remained able, after losing her vision, to excel in each of the functions. If we were to decide that driving is not essential, do you automatically win? Then I believe it goes to reasonable accommodations. Well, I'm asking what happens then. What happens in this case, if we were to decide that driving, physically driving, using the steering wheel and the gas, if that's not essential to the job, then where do we go? Then the employer and the... I'm talking about in the facts of this case. What happens then? There's an issue of fact for the jury on reasonable accommodations. Well, why is that so? Well, again, Ms. Sloan's going to address that specifically, but... You're not going to address it at all? Okay. I'll address it. Under the ADA... I know what the law is. I'm asking actually, what's the next step if we were to send it back on that reverse summary judgment, if we did? Yes, sir. But I just want to make this point. If we were to find the driving was not essential, that wouldn't automatically mean summary judgment had to be reversed, right? It wouldn't automatically mean that. It would mean summary judgment would have to be reversed on the issue of essential functions. But you've got to win the case, though. Right. So it would go back, but then you have to decide reasonable accommodations. Well, it could be decided two different ways. That driving thing, we could say there's a question of fact... Yes. ...and send it back for a trial to see whether driving was an essential function. That could be done. And a jury could figure that out. Yes, sir. And then you would, after the jury figured that out, you'd have the reasonable accommodation. If the jury said driving was an essential function, then you don't get to the reasonable accommodation. Then it's over. Right? In terms of the issues of fact, it's over. If the jury decided it wasn't an essential function... No, but I'm asking... It's over. Opposite. I'm asking you, what do we do in the posture of this case if we decide it's not essential? If we say it is not essential, I don't think you automatically win summary judgment, though. I mean, you don't automatically defeat summary judgment. Our argument is that there are issues of fact on reasonable accommodations. Well, let's talk about that. I mean, at some point, I want to talk about that. Yes, sir. It seems to me it may fold. It strikes me that if it is, if we say there's a possibility we could say it's not essential, it was a non-essential function, but there was still reasonable accommodation on that. You disagree with that, but I mean, we could find that, correct? In which case, summary judgment would still stand. Well, Your Honor, we do feel strongly that there are issues of fact on reasonable accommodations because there should have been an interactive process. There should have been considered. Good. Now, tell me why. There was some discussion. Very little. Well, she asked for three items and she got two. She didn't get the other. They did come back to say to her, I think, I could be a little off on the record, but it's my understanding that Pfizer convened a bunch of HR-type people and they talked about what to do, and they came back basically with the comment is liability questions involved. We worried about the safety of the drugs being absconded with and things like that. Why wasn't that enough under the law? Because there was no dialogue as to how this non-essential function could be accommodated, how this, Ms. Stevenson, could be accommodated so that she could get to the doctor's offices. The only accommodation is to hire somebody, and the question is whether when you hire somebody who would essentially be full-time, you now create a new employee, even if she pays the driver. Whether the company pays the driver or she pays, the driver would be an employee, and that creates a whole new structure for the company. It could be an independent contractor. If... It could be an independent contractor. We could have a driving service that was contracted, just like... She lives in Winston-Salem. Yes, sir. And she calls on doctors, right? Yes, sir. And most of the doctors around there are in Winston-Salem. You've got two... Within a 50-mile radius. You've got a... 50-mile radius was her territory, but the two big medical centers... That's correct. ...in that 50-mile radius are right there in the middle of Winston-Salem. Yes, sir. They're right there adjacent to where she lives. I looked up where she lives in the record here. She lives over close to St. Silas Creek Parkway. I know a little bit about the geography down there, and those two hospitals are within two miles of where she lives. She could walk to them, almost, if she could get across that parkway. There must be a bridge somewhere, a walkover. But there's also city buses, and between those two hospitals, there are buildings full of doctors. Is that true or wrong? That's true. Okay. Now, what percentage of the doctors that she visits are located in and about those two hospitals? The Bowman Gray Medical Center I'm talking about, the Wake Forest University, and what I call Forsyth Memorial, which has some other name on it now, Newmont or something? Yes, sir. But where... There are stones, though, where she lives. Where else are there doctors around here? A few up in Mount Airy. She doesn't go to Lexington. That's correct. There might be one somewhere else, a few more somewhere else, but most of them, most people in Mount Airy, if they're in bad shape, they come to Winston-Salem, right? Yes, sir. Those are the two biggest medical centers in the area, right there where she lives. That's true. You've never emphasized that here at all. And that's because... You can take a cab, Uber, Uber, but you can get in one of those buildings that are full of doctors. That could have been considered in an interactive process. There's nothing to keep them from considering that. You have to offer, as I understand the law, you have to offer up a reasonable accommodation. And she said, hire me a driver, correct? She said, I need a driver. Right. Let me ask this. Is your argument then, I'm trying to piece this together, that they didn't come back and talk to you about that point? They didn't come back to you and say, you might can get a driver, but you might have to pay for it, or you can use Uber, or we'll readjust your... That's what you say is how they failed in the interactive process on that issue, on the driving issue. That's correct, Your Honor. I thought they offered her also some in-house positions. Well, Your Honor, that's kind of irrelevant to this appeal, because there was only one position offered, and that was a position that was an entry-level position for somebody with a high school education. That's all they had open. Well, it's make work. I mean, it's just like this court found in Montgomery County. But it's relevant to the dialogue. In other words, they didn't just close the door. They were trying to figure out, this woman was a valuable asset to the company. But the other side of the coin is to have a paid driver changes the nature of the process. You have a new employee. You have all the liability issues. You have all the payment issues. You have precedential issues. Now you're going to create a single-person job into a two-person job. What about all the others that say they want just a driver? I mean, this is... So you'd have a precedent that when one of your star employees went blind, basically, you would work out a deal for her. That may not be such a terrible precedent. But your argument is, I don't understand the argument. Everything that Judge Nima is asking in this question, of course, is true. But your argument, if I understand it, is they did not have an interactive process with us over the thing that mattered most in accommodation. They offered us other jobs. But what we were interested in, and we think we're entitled to, is an accommodation on this issue in this job. But they did not... I'll go a little further than that, Judge Shedd. They did not offer a reasonable accommodation alternative to a driver. In other words, she was asking for a driver so she could keep doing her job. I'm lumping that into, you wanted them to negotiate and talk to you about how do we get her from place to place so she can still do the job that she has. And they never did that with you. They didn't do that. They did discuss, and at their insistence... Let me ask this. What if we were to say this is not an essential part, contrary to what the other side argued? If you were to assume that, what would then be the posture of the case? It would be sent back, and they would... What would happen then? There wouldn't be another chance for the company to negotiate with you, or that would be by way of settlement. Otherwise, you would just go to the fact finder on the facts and the record as to whether or not there was. I think all that's right. And the result would be what? You would be seeking her job back with an accommodation, or you would ask for damages, or what do you... We have asked for damages. We have asked for reinstatement with the reasonable accommodation that she proposed of some kind of driver. But you think then, under the scenario I've laid out for you, that if we reverse summary judgment on... And by finding that the court was wrong basing summary judgment on essential nature of this to the fact finder to decide who was right and wrong on the process? Well, there are two issues. Yes, sir. But there are two issues that the judge decided. He decided essential functions, and he decided reasonable accommodation. He took both of those issues out of the province of the fact finder, which this court... But you can do that. You can do that. Of course, you can do it if the facts allow you to do it. But didn't he decide on the function, it's an essential function. Isn't his ruling based on the fact it's an essential function? That was his first holding. And he found, he said, I find it's an essential function. Sir? He said, I find it's an essential function. Yes, sir. Is this, whether it's an essential function of question of law or question of fact? Question of fact. This court has decided in two new cases this year, it has amplified the fact that these are issues of fact for the jury. Both in the Jacobs case and in the Montgomery County. Your argument is not that there can never be a summary judgment. No, sir. I can never argue that. A summary judgment is always a procedure that can be used. I'm saying in this case, based on the evidence, there is evidence to support issues of fact. Well, Judge Schroeder said there's a genuine issue when he was looking at those criteria that the EEOC set up. There's seven. Yes, sir. A list of seven. Number two is job description. Yes, sir. He says there's a genuine dispute about what the job description provides on this essential function of driving being an essential function. He said that. Yes, sir. OK. And there are other, and we pointed in our brief, I mean, those factors, if I could just finish this thought, those factors that EEOC has provided is to allow the fact finder to make an objective determination on those essential functions. All right. Uh, we'll hear from Sloan. Thank you, Your Honor. Good morning, Your Honor. Barbara Sloan for the EEOC. Um, I'm hearing that you'd really like me to talk about reasonable accommodation. Um, I was going to talk about three things, but I'll start with that. Um, the defendant's position seems to be that if we've always done something one way, it's an essential function. But the statute itself, and so do the regulations, belie that theory. Because there are reasonable- Well, it's actually more than that. It's not, it's more than that. We've always done it that way. It's if we've always done it that way, and we deem it to be essential. Right. Right. And that's- And they get a car. They do, but Your Honor- They have a company car. She has a company car. But if they hired in a- That sounds like they expect her to drive. OK. But if they, if they check her driver's license, but if they hired a driver, they would probably want to make sure that that driver were also a good driver. So it seems to me that is a piece of evidence that we can consider. That sounds like accommodation rather than an essential function issue. It seems to me one test might be if they promoted a job with just what is described, that is we are looking for a salesperson to cover a 50 area, 50 square miles, or 50 radius, 50 miles, to call on doctors and promote our drugs, and we supply an automobile. And somebody comes in at interview and said, my license has been revoked. I'm otherwise qualified. In those circumstances, does the company, would the company hire the person? Reasonably not hire the person, right? Well, the individual would only be entitled to a driver, or whatever, if the reason that they can't drive, I'm getting, I'm responding. If the reason that they can't drive is because of a disability, if they just have a DUI. No, no, that's the nature of the job. And the person comes in and says, I can't drive for whatever reason. I'm saying he's a suspended license. It's been revoked permanently and doesn't have a driver's license. And the person talking to the applicant says, well, we can't use you because we have doctors in this 50 mile area. They'll be called on individually. You have to carry drugs around and make these promotions. And we could use you in-house, but we can't have you for this job. Now, doesn't that sound like what this situation is? Well, it doesn't, your honor. The individual doesn't get the job unless the reason that he or she can't drive is because of a disability that prevents them from driving, which is a response to the defendant's- They can't drive. They just can't drive for whatever reason. But it matters. It's essential to call on these doctors, have one person, we give you a car. We're not giving you a fleet of cars and giving you drivers and secretaries and so forth. We have a job for a traveling salesperson who's going to call on doctors and promote the drugs. And we give you a car and you have to visit these doctors in this 50 mile area. Now, the person says, for whatever reason, I can't drive. Then the company's going to say, I'm sorry. We need somebody who can drive because that's the inherent nature of the job. We could hire you for something else. Now, you're trying to make it into- I'm not talking about whether that's caused by disability. I'm trying to address the question as to whether it's essential for the job. Well- You're saying it's not essential for the job to be able to drive in that circumstance. Because it's a way of going to visit the people. It's the manner, not the result. Let me ask- The result's important. I mean, the result's very important to promote drugs. But the job in this case is to promote drugs to doctors in a given area where you can't get around with public transportation. And that was preceded in the record. The employer is absolutely entitled to define the job that way, unless the reason the individual can't do an essential- can't do the job- Let me ask this of you. What if you have that hypothetical and add to it that the company does have a saleswoman in New York City who doesn't have a driver's license? Never drives. She just- and they- it seems to me that makes it not look so essential to the sales job. It's true, you've got to get there. You've got to show up at the doctor's door with the samples. But it's- I mean, doesn't that speak to whether or not the driving is essential to the job? Yes, it does. And I- our position is that at a minimum, it's a jury question whether driving is essential. Back to the reasonable accommodation. You heard my questions. Why- they have to engage in an interactive discussion. But in this case, I think the record indicates they said, we'll give you two of the three things you want. And we're having meetings on the other, but we aren't going to do anything. We're not going to hire somebody for you. Why doesn't that meet what they had to do? Well, the reason they didn't want to do that is because- No, I didn't want to do it. I said, why doesn't that meet their obligation to do it? Because the interactive process is designed to enable the- to come up with an accommodation that enables the individual to do the job. What would they have to have done in this case? Explore the possibility of how she can do the job. You mean sit down with her and go, we're not hiring somebody for you. She might say, well, I'll pay for them. Or you take the car expense money and I'll- you just think that part had to at least be explored. Well, yeah. Yeah, but it's not a separate violation, Your Honor. I'd like to point the court to Borkowski before I sit down. What is the name of the case? Borkowski. It's cited in our brief. Okay. Very well. Thank you. Citation's in the brief. Okay. Ms. Lewis. Thank you, Your Honor. May it please the court. My name is Stephanie Lewis. I'm here on behalf of Pfizer. With me at council table is Danielle Rosen, Senior Corporate Counsel for Pfizer, and Jonathan Roth, an associate in our office. This is an unfortunate case. Pfizer wanted to keep- Let's go straight to the law, though. Isn't your whole case built on the fact that the driving, her actually operating the motor vehicle, is essential? The whole case is not built on that. While it is true that the factors point conclusively to driving being essential, to answer your question- So let me say, was the district court wrong on that point? The district court was not wrong. The district court- So is it essential or is it not? It is essential to drive in this position. Why didn't y'all write that in the job description then? If that's an essential function, it seems to me that it ought to be written down in the job description. The job description- And you don't do that. The job description is very broad. It speaks to core competencies. But it ought to have the essential functions in it. It speaks to core- That's what I would think a job description is for. It speaks to core competencies. Why wouldn't it say you have to drive? You have to have an operator's license and you have to be a safe driver or whatever. You've got to be a driver. It also doesn't say you have to travel. Ms. Stephenson admits that travel is an essential function. It's very broad. It speaks to core competencies. And this court, in the Martinson decision, Judge Motz's decision, held that maintaining store security was an essential function. It was not in the job description. Let me ask you this. Even if the job description said it, that wouldn't define it for purposes of law, would it? That's correct. So in other words, you could have put in there, but you still not went on that point. That's correct. The only- You'd have a better argument, though, if you put it in the job description. Drapinski in the Eighth Circuit case also held the absence of the function from the job description does not defeat summary judgment. You think this- It won't defeat summary judgment, but it causes you a problem when you didn't write it down. It's like it's an afterthought. Well, it- You came up with the idea. Now, when you hired this woman, the job description didn't have driving in it. It's a good- That's what the facts are. It's a good point. We just deal with the facts we got.  This isn't a case where this is an after-the-fact justification made up in litigation. She was provided a company car. All sales representatives are provided a company car. She went blind. There's- But she knew- And she's got an eye problem. Sure, but she knew all along that driving was required of the position, and that's how she did the position and always how she did the position. It doesn't feel essential to me. I want to take you back. If you have a sale rep in New York City, I presume you do, and you could give her that territory of 20 blocks, probably enough doctors in the right location, would you insist she get in a car and drive there, drive 20 blocks? If the public transportation was available to take her to all of the appointments, likely not, but that goes to- And the record is that there are no sales representatives in the country. Couldn't find a place to park up there in New York City. Including New York, the record is all sales representatives drive. Wait, wait. But you understand my point. Yes, I do. You can clearly think of a situation where operating the car is simply not in any way required, needed, or even beneficial. It's a great point. It's a great point. It goes to the regulatory factor. I'm not right on where the doctors are who went for sale. Well, some of the doctors are exactly where you described, Judge King. Now, her territory does span to Kernersville, Mount Airy, the southern- Well, I know it does. It goes outside of town. But those folks get sick, they come to town. They come to Winston-Salem, most of them. Now, she testified- You get referred in there, and those doctors are all over that area. Ms. Stevenson testified she had to drive to four to ten- And Oman Gray and that Forsyth Memorial. She testified she had to drive to four to ten different locations each day. Some of these are small health care providers all throughout the territory. She lives in the center of the territory. She says it's a 45-mile radius outward. She testified- What percentage of them are within two miles of those two big medical centers in Winston-Salem? It's clear not enough, because they actually looked at one of the accommodations of having her based at Wake Forest alone, redefining the territory to just serve that. And they determined there wasn't enough business there. What percentage of her- There's no evidence in the record as to that. But she testified she had to drive- You all know what it is. She testified she had to drive from 830 to 530 every day. There's no question that this position that she's in requires travel throughout the territory every day, all day long. Let's talk about travel. Are there other ways to get her to the location without her driving? No. Excuse me? She could drive- Take a cab. No. She could ride a city bus. She could walk. What do you mean there's no other- I mean, there's no public transportation. You'd have to hire a driver. I'm sorry. No, I didn't ask you that. I said is there any other way for her to get to her locations without her driving? You'd have to hire a driver. There's no other way for her to get to her locations other than having a full-time, permanent driver. So the answer to my question would be she doesn't have to drive herself to get there. Essential function to drive her. Now, listen to me. Let's leave essential function aside because that's the definition we're going to work into. Let's make it simple. Is it physically possible for her to get to where she has to go without her putting the ignition, starting the car, steering the car? Is that possible? It is. It requires a full-time person by her side every day, all week. I didn't ask you all that. So it's possible. Yes. Right? And so now, but there's something that has to be done to enable her to do the job the way you want her to do it without actually driving, correct? To what extent did you discuss that with her and those options? Did you sit down and have a discussion on that point? In the first set of discussions, you'll see in the record that John Harp, that human resources representative, wrote her and said that driving was considered essential and that they were having difficulty envisioning how the job could be done. So then the next call, the record reflects, he discussed driving with her again. And they talked through options. She said it was essential. And no, they had a discussion about her idea of having a driver. And he said he would explore that. He talked to the decision makers. And they did. They talked about it and they determined it wasn't feasible. But did you ever talk to her? Isn't all of everything you did in this case for the company, hasn't your position been from day one to right now as you stand here? It's an essential function. Yes. Driving the steering wheel is essential. Yes. And because it is essential, there's no real accommodation to take care of that. Isn't that your argument? That is the argument. Well, aren't you required under the law to have some discussion with her? It seems to me it makes sense. You would sit down and go, look, we think it's essential. You don't think it's essential. But you've got to get there. Now, how do you propose that? And how much are you willing to give? What are you willing to do? Could we take your car allowance and give it to you, look at liability issues? Aren't you required to do some of that? You just say, we think it's essential. We deem that it's a liability issue, which, by the way, I don't see how it's a liability issue, and I'll tell you why in a minute. Is it your position? You just say, in conclusion, it's essential. We thought about it. Too bad we're not doing it. That's all it takes. The record is clear that the guys are engaged in an interactive dialogue. It can't be disputed. Not on the question of somebody replacing her as the driver. But that would require them to talk at length about her preferred accommodation, which the law does not require. And the law doesn't require you to exempt an essential function. So the law doesn't require extensive discussion about something that isn't required. Because that's based on you thinking it's essential. It may not be essential. Now, it's clear that they looked at other options. Not to do with some kind of accommodation on somebody driving her or working out something like that. I'm not aware of a single case in the country that says if you fail to discuss at length one specific preferred accommodation, you've failed the interactive dialogue. That's the only one that mattered, though. That's her preferred. No, no, no. The only accommodation that mattered to her job, really, was getting to the daughter's office. That's the one that matters. Don't you think? Because you all say, you want to do it? We're not going to do it. OK. We've talked. It seems to me that there should be some further discussion. It seems to me you'd be much stronger footing if you'd said, we talked to her and said, look, we talked to an insurance carrier. They told us it's going to be astronomical. We can't do that for fear. It makes business purpose doctrine driving on the road. And talk through it with her and talk about options. Would it? Pfizer did explain the steps that it had taken to look at liability concerns. They didn't do anything like I just said, though, did they? They didn't go that far. But the law doesn't require going that far. You know what? I would like it if you would answer my question. I said they didn't do that, did they? They didn't go that far. Don't put in that. Did they discuss with her what I just said? They discussed some of what you said. Did they say to her, we understand you need a driver. We think it's essential. But we understand you don't. So we're going to talk to you about it. Did they say that? They did talk to her about it. They say that we are considered essential, but we think what you don't. So we're at least going to explore that. It might not be essential. Did they ever do that? I don't know that they explored that. It might not be essential. But they just say I'll rest with that, too, because I don't think they ever did. Number two, did they say there might be a way? Let's talk to you about ways you might have to contribute some money to this. Did they say that to her? They did not. The cost was never an issue. They didn't talk about anything about exploring the option. Cost was not the reason for the decision. Cost was. Did you ever offer to split the cost of the driver? No, because driving was. He says in their brief that they'd be willing to throw in to help pay the driver. In the brief, they say that. Of course, the record is that she never. But he says that in brief. The cost is not the factor. And I would just ask you what. I'm following up with Judge Shedd on what you'll negotiate. Even in the record, it said they were prepared to talk about it. Talk about it. What was the factor that caused them to reject a driver? That driving is an essential function. If you look at the seven markers in the EEOC regulations, which have been. I want to know factually. What did they, what did the company conclude about why did they not want a driver? Okay, so let me talk a little bit about why driving is essential to Pfizer. So the sales representatives drive. No, no, I wanted to know what the record showed about why. The security. Pfizer didn't. Security and liability concerns in the amount of time spent driving. That you have to drive from 830 to 530. The representatives take the samples with them and lock them in their trunk. While they are sampling the physicians, their security concerns around. The regular regulatory environment of these pharmaceutical samples. And the chain of custody. So they were concerned about having another individual have access to pharmaceutical samples. They couldn't wait, wait, wait, wait, wait. Let me just finish my question. Is that it? Well, and, and so also to the point that the individual would either be an employee of Pfizer or be treated as a co-employee. There's no, no way to sort of. You have to take on somebody else and change the entire operational structure of how this position is organized. And security for the drugs. So why couldn't you have sat with her and said, okay, you can have a driver, but I'm telling you this. That you lock the trunk, you keep the key lock for the trunk yourself. And that driver, whoever that person is, walks in and sits in the doctor's office every minute. That takes care of any security concerns. Well, the ADA demands deference to the employer's judgment about how to structure its business. Pfizer structured its sales representative. Wait, wait, wait, wait. You're not suggesting, are you? That if we came up with that kind of accommodation, the ADA would go, oh, you're trying to keep employed a woman who has a disability? Can't do it. You don't even suggest that at all. No, not at all. If you could come up with an accommodation that you thought was reasonable, she thought, I bet you that. We tried very hard to make that happen here. They would defer to you, wouldn't they? We tried very hard to make that happen here with Ms. Stevens. It's because of her insistence. No, you're dodging my question. You said that some of the agency is very strong on how those drugs are kept and all the security. They would defer to you if you had a reasonable accommodation for a person with a disability, wouldn't they? No, we have no reason to believe that. This is a heavily regulated environment in terms of the chain of custody. But a chain of custody wouldn't change. Even if travel— It wouldn't change one iota. There's an additional person with access to the drugs— No, there wouldn't be. —under the system right now. It wouldn't be at all. She would have the key in her hand every second. I mean, it could be. She'd have the key every second until the person put it into ignition. You stop the car, give the key back to her. And it walks in. Why is that? That's not even a security question. My point being, your company came up with conclusions, but she didn't talk to her about those because you didn't feel you had to, right? Because your position is operating the vehicle, driving, we call it, is essential. Yes. In light of the amount of time— Do you agree that whether driving the car is an essential function is a question of fact? It is not a question of fact. Now, the regulations say it's a factual determination to be decided on a case-by-case basis. And it could be a question of fact. Were there a factual dispute? Here, there are no factual disputes. There are seven Fourth Circuit cases deciding this as a matter of law. The district judge said he found that it was an essential function. He also said— Now, when judges say find or found, it sounds like they're talking about factual issues, doesn't it? It sometimes does. If they're talking about legal issues, they usually say conclude. Conclude or hold. What they said. We always talk about conclusions of law and findings of fact and that kind of thing. But at the outset, he says that there is no disputed evidence and no disputed fact. There's a genuine dispute over that thing. The job description. On the job description. But we— Genuine dispute. FISA Act concedes that the job description does not have driving in it. Just simply as a matter of law under the Fourth Circuit precedent, that doesn't defeat summary judgment. That's just simply an oversight on the part of FISA not putting it in there. It's just a broad description that doesn't include things that— And there are decisions that talk about— Is it true now that her license has been revoked? Yes, she cannot drive her license. Because of oversight. She does not qualify for a North Carolina driver's license. If you had— Is it possible you could have a salesperson in a big city that would not need a car at all? It is possible. And it goes to one of the factors in the EEOC regulations, the consequence of removing the function. So that's what fact determination— Let me say this. So if it's not necessary to the job, doesn't that seem to say to you that it's not essential? That's why it's a factual determination in each case. In North Carolina, there is no public transportation. You know what? You're so anxious to make your argument, you're not answering my question. I'm saying, doesn't that seem to indicate that it's not essential? If it's not— You can— We can easily envision a circumstance in which it is not even desired. It may not be essential in a different case where public transportation is available. But that's only one factor. That's a different job. That's right. This job requires driving, and there's no dispute. What about taxi cabs? Why couldn't you ride a cab, particularly around those places down there in Winston-Salem? The evidence is— As you and I know how close those hospitals are. The evidence is she would require a driver to be with her all day from 8.30 to 5.30. Even the affidavit of the driver says— I'm not talking about—I'm getting away from the driver. Why couldn't you just take a—you said public transportation wasn't available. Taxi cabs are public transportation. They have taxis in Winston-Salem, North Carolina. It's a big city. A quarter of a million people. So because you have to go to so many sites throughout that broad territory— She can get one of those things that the government have—they carry nuclear weapons controls in briefcases strapped on their wrist. That's secure. You don't have that in the trunk. Because of the nature of this job, you're calling on physicians with limited time. You don't know how long the meetings are going to last, when the requirements of the workday are going to change. Her testimony is that she's on the road the majority of the time for that reason, and she needs somebody beside her from 8.30 to 5.30 to do this job no matter whether you say it's driving or travel, to your point. Even if it were travel under the recent decision— But you don't need to—if she can call—I don't even—my point is, we're raising questions. Your answers may be good. They might not be so good. But it seems to me that this is a process that should have taken place at the job site with her and not with three judges and a lawyer. I mean, the cab companies in every big city who have an arrangement, you call us, Judge Shedd—I can't afford to travel by taxi, but I use law clerks instead—but I said, Judge Shedd, just call us at this number, and we'll have a car there for you in five minutes. That happens everywhere in America. But it requires her to have somebody all day, every day, every day of the workweek to take her from appointment to appointment throughout this broad territory. What if she were to say to you, I'll pay for it, and you'll negotiate it? It requires another individual on a full-time basis, no matter how you characterize it. What if she says, I will pay for it? It still exempts an essential function or requires someone on a full-time basis. No, no, no, that's based on your belief it's an essential function. Even if it's travel, it requires another person on a full-time basis, which none of the cases have said is a reasonable accommodation as a matter of law. So the fact that you need a taxi driver all day— An essential function? Even to assist with an essential function— But it is—but by the way, so do you can—for argument's sake, do you concede when, even if it's not an essential function? I believe we win, even if travel is the essential function, because there's not a case that's cited where somebody has to be hired on a full-time basis to assist with an essential function. And in your recent opinion— But it's not an essential function. Lewis v. Gibson, you just decided the Fourth Circuit held as a matter of law that the person wasn't entitled to an assistant to help with an essential function. But by the way, listen to me. I think your position is being this is an essential function. It rises and stops on that. No. In fact, if it's travel, as they say that it's travel, we also hold that it's not reasonable as a matter of law, per se, to hire another individual on a full-time, permanent basis, which is the only thing that you could do to accommodate— And you say—and it has to be either driving or travel. So any way you look at it— Any way you look at it— The way we look at it, you win. Either way, we win. So you win. And the EEOC model— So you don't have to negotiate when we're thinking about— There's nothing to— There's nothing to accommodate. There's nothing to accommodate. So you shouldn't even—you don't need to talk about accommodation because you win any way you look at it. But we did talk about it because we wanted very much to keep her employed. We just talked about the driver. You didn't talk—but isn't it clear to you that the key point to her is the driving? That's very clear. And it's very clear. And you didn't talk to her about that. You just denied it. We did talk about it. We didn't talk about it at the length that you suggested. Well, you didn't talk about it in any way that offered any real—is there any— We were not going to exempt that from— Is there any indication in this record, whatever, that Pfizer ever even considered getting some kind of driving assistance for her? No, that was not considered. You didn't talk about what she cared about most. And the interactive— You say that's not required. It is not required. And in fact, no liability arises— What's the purpose of accommodation then if you don't talk about the one critical issue? What good is—so somebody says, I can't—I need some help to read these documents. And also, the coffee's too hot for me in the morning. And they go, you know what we're going to do? We're going to make the coffee cooler. As far as reading the documents, we just—we don't care. We're not going to talk to you about that. That's your approach to it. That can't be right on the law, can it? You have to—the purpose of the reasonable or the interactive conversation is about the issue that matters. And you haven't had that on driving. They did discuss driving with her. But not in any way that was interactive to try to explore the possibility. You gave her some conclusions, right? But you didn't explore any of that with her. Even if Pfizer had failed entirely to comport with the interactive dialogue process, which I don't think the record supports that conclusion, but if that were the conclusion, it doesn't give any kind of independent liability, even under the EEOC Womble-Carlyle case just decided. That point is made abundantly clear in the Fourth Circuit as a matter of law. Unless a reasonable accommodation was identified by the— Well, it was identified. Not reasonable because you do not need to exempt or hire a full-time person. For an essential function. You don't have to hire a full-time person even for a non-essential— Your notion is that even if travel, which they concede is the essential function, it still needs a person. That's right. And the law does not require the hiring of a person. That's right, Your Honor. Let me ask one other question. But does it—taking that position, does it then preclude a possibility that we can all think of another option? Maybe she—maybe your husband. What if her husband just goes, you know, I love her so much. I don't know the marital situation. I don't know. But I love her so much if she's married. I'm retiring. I'm going to drive her. In the— I'm going to drive her. In the Hendrix v. AT&T case, Judge Curry's case out of South Carolina, the spouse wanted to drive. And Judge Curry said that's not a reasonable accommodation as a matter of law because that's another individual assisting with a function. I know that's Judge Curry. I'm asking—this is the Fourth Circuit. Right. I'm asking you about—but why not? Why wouldn't that be at least something to be discussed? See, what you're saying is we didn't talk to her about the things that matter to her. That's what you've said. That's true. You aren't giving away anything. That's clearly the record. You didn't talk to her about reasonable adjustments on the driving or the traveling. And you say—by the way, anything she probably could have come up with, we'd have denied it anyway. But that's not any kind of process. So you think there is no required process? It's a meaningless process? Or what do you have to do in that interactive? What do you have to do? The interactive— Just give a reason? No, the interactive dialogue is simply a discussion, which was had here, about possible accommodations. The idea that you have to discuss one preferred accommodation at length in order to discharge that obligation just finds no support in the law. I know that, but doesn't the law support that? Wouldn't it? Or maybe it should. You have to at least have an interactive conversation about what matters, the core of the case. Don't you have to do that?  They looked at— I said that's why I used the core of the case. But don't you have to have a discussion or some overture on the critical thing and not just the conclusion? She says, I need some help getting there, and y'all go, too bad, we're not doing anything. The court may disagree with it, but that simply isn't required as a matter of law to discuss something that is not required by the law. No, no, no. Wait a minute now. When you say it's not required by—as a matter of law, you mean as a matter of law it's not required? Or it's just as a matter of law— Both. You don't have to have any discussion with her about the most important— As a matter of law, you do not have to discuss things that have been held per se unreasonable under the ADA as this has. So anything here would be unreasonable because she has to travel or drive something, so there's nothing that you can do for her? In terms of the sales representative position. She couldn't see well enough to drive, so that's the end of the story. So in terms of the sales representative position— But your answer, it seems to me from your previous answers, is while travel is essential and everybody seems to agree to it, the only solutions that are conceivable and have been thought of involve another person. That's correct. And once you get another person in there, it's not an economic issue, you say. It's a question of liability. You now have an employee, you have unemployment insurance, you have pensions and all the other things that the law requires. That's correct. And we'll not let the husband work for the company even though he wants to because he's not an employee. That's correct. And it goes back to deferring to the judgment of the employer about how to set up the job. But no, that's not correct, though, because you gave the same answer to the taxi driver. That has nothing to do with unemployment insurance and all that. Well, that's a whole other entity that has to be engaged on a full-time, permanent basis. No, it's not full-time. 830 to 530 is what's in the record. Every day, 45 days, 45 weeks of the year. That's in the record. That's what's required for her to be able to travel to these physician's appointments. But by the way, but wait a minute. Just wait a minute. You don't stand there and say common sense that that eight to five controls, do you? Taxis don't have to wait for you while you're at an appointment. Did she say somebody has to be at her beck and call every minute? She didn't say that. The testimony. I know what you said, and I saw a testimony. It doesn't read. That's not certainly not the only reasonable inference. Y'all admit she goes to a doctor's office, and then she meets with the doctors, right? Yes. But there didn't have to be somebody at her side for that. The amount of time she's at the doctor's office will vary from day to day, from appointment to appointment, and based on the doctor's availability. I don't know, but you said no. Someone has to be there. Questions were ambiguous, and the answers were ambiguous. But then I read the questions and answers. But then the affidavits also say the driver has to be from eight. She's not on the road 90% of the time. She's from her home to coming back 90% of the time. She lives right next to those doctors. I looked it up. I know she lives down there on Silas Creek Parkway, off Silas Creek Parkway, and those two hospitals are right across the road. I know Silas Creek Parkway well. I know you do. The Eighth Circuit. They're right across the way, and all those doctors are everywhere through there. The Eighth Circuit. They're the two biggest medical centers in western North Carolina. The Eighth Circuit and the Tenth Circuit both involve substantially less driving, 50%, 20%. You know what, though? When you were at the Eighth Circuit, what you said was she had to have somebody by her side every minute of the day. That just isn't true. David's saying 830 to 530. You know that not to be true. Is it your? Now, be very careful how you answer this question. You're telling us that both the job requires somebody to be at her side every hour she's employed by you, I mean working, and that she has indicated she has to have somebody by her side. I'm not saying by her side. I'm saying shepherding her through her day every day from 830 to 530. Carrying her somewhere. Yes. Thank you. Mr. Connors, I'd just like to make two quick points, I think, maybe three. First of all, on the third person, whether the law requires, the ADA requires that the provision of assistance of a third person to help enable a disabled person to do the essential function of the job. Borkowski and Nelson are in our briefs, and they require a reader. And of course, the ADA itself requires a reader. But going more to Judge Shedd's point on interactive process. She can still read on her own, can't she? She can still read on her own. I thought she lost, what, 60 or 70 percent of her sight? Yes, sir. Well, I mean, she can read on the computer with the magnification equipment. Yes, sir. But going to the interactive process, I don't think that's the only issue. I think the interactive process gets us to the point where we look at alternatives and make a decision. Let me ask you, there's a lot of fighting in the briefs about whether she has to do the driving or whatever. And you seem to agree that travel is essential because of the nature of this job. She has to call in an area and travel. Isn't the only discussion or proposal on the table the use of some other person to carry out that for her? In other words, I don't care whether it's a taxi, a hired driver, a husband, it was not an economic issue. It's an issue of once you have somebody full-time under the direction of her, case after case will say that's an employee and you've got all the employee problems, liability problems, you've got the overtime problems and all the other things. And the company was unwilling to change the job to have two people do it as opposed to And it seems to me that's the argument I hear Pfizer making. It's not a debate as to whether it's essential. It's essential to get around. And the only way to get around that anybody's proposed is to have some other person do it on a full-time basis. Well, but there are different ways to do that. There are different ways, but it always involves another person. It always involves another person, but it doesn't always involve overtime, liability. They know how to protect the person full time. She said it herself. It involves full-time. She doesn't know when she comes and goes in these appointments. A doctor's at lunch, so she goes and calls somebody else. She goes here and there. She goes to, what, 10 or 14 different places every day in her car. She could call a cab when she comes out and she could go or Uber. No, she sits there and waits. Now she can only call on six or seven a day. Those are the facts that haven't been developed. I mean, there are alternatives. The suggestion is always somebody else. Now, if you have somebody full-time, I don't care what you call them, even an independent contractor, you've got liability issues. Let me just make this last point, which responds to that, Your Honor. In the record, there's insurance policies, there are indemnification agreements, and there's the- But you can't make a company restructure the company and hire new people. That's the point. They have a job which has been carried out by her and by other salespersons, driving themselves. They give them a car. These people are hired to do that job. Now, the proposal is she wants somebody to assist in travel, getting there. Doesn't have to be a hired person. It could be a service, as we've all discussed. Except all throughout the law, when you have somebody full-time working to assist her, to carry out that function, I don't care whether it's a taxicab driver who stays with her or an independent driver, you now have an employee issue. And if you're general counsel of the company, you can make the decision as a business decision. We do not want to hire another person to do this job. Which would go counter to the ADA, Your Honor. It would go counter to the fact that the ADA- That's a legal question, and I'm not sure- Well, the ADA requires the assistance of readers and interpreters and other types of third persons when it's necessary. Let me tell you, that's why I took us to the interactive conversation, because it strikes me what's going on here for the last 15 minutes. It seems to me fairly reasonable. That should have happened between the company and your client at some point in this process. Maybe they could say, they could chart out, look at the rates it's going to cost us on liability. Well, what if I use a taxi driver? It seems to me she made an offer, hire me a driver. She's not going to negotiate against herself. She asked for the best she could hope for, and then the interactive process, they come back and go, that's not going to happen. But what about this? Well, we don't like that. We can't do that. It seems to me, but maybe people don't see the interactive process like that. That's exactly right, Your Honor. I mean, it started and stopped on November 28, 2011, when that email was written by John Harp and said, we're not going to consider that. That's when it stopped. And they do hire, just want to make this clear in the record, they do hire publicists or publicists, which is a contractor who carries out all their duties for them, so they've apparently worked out any kind of liability concerns or any other- And they also have cars to drive people somewhere. And they have limousines to drive their executives. Thank you very much. Thank you. We'll adjourn court for the day, come down to Greek Council.
judges: Paul V. Niemeyer, Robert B. King, Dennis W. Shedd